**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

IVAN TORRES,               )
                                       )
               **Plaintiff,**      )
                                         )
v.                                      )       **Case No. 4:14-CV-552-JED-JFJ**
                                         )
**REX TILLERSON, Secretary of State of** )
  **the United States,**           )
                                         )
               **Defendant.**      )

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant Rex W. Tillerson, Secretary of the United States Department of State, through counsel, files the following Proposed Findings of Fact and Conclusions of Law following a bench trial conducted September 18-19, 2017.

## I. DEFENDANT'S PROPOSED FINDINGS OF FACT

1. Plaintiff Ivan Torres filed this lawsuit on September 18, 2014 (CR 2), and the operative complaint on February 19, 2015 (CR 18), seeking a declaratory judgment of United States citizenship pursuant to 8 U.S.C. § 1503(a) following the Department of State's denial of Plaintiff's application for a United States passport. The sole issue before the Court is whether Plaintiff was born in the United States and is therefore a citizen on that basis.

2. Plaintiff's mother, Gloria Gaona, married Plaintiff's father, Leobardo Torres, in February 1988 in Mexico (Tr. 16, 22.) At the time of the marriage, Ms. Gaona was 16 years old. (Tr. 16.) Neither of Plaintiff's parents has ever had lawful immigration status in the United States. (Tr. 23.)

3.     At trial, Ms. Gaona testified that, shortly after the couple's wedding, her husband came to the United States, and she followed him in March 1988. (Tr. 16, 26.) Ms. Gaona did not travel to the city where her husband was working (apparently Houston, Texas), but instead came to Tulsa, Oklahoma. (Tr. 16-17, 26-27, 29.) When Ms. Gaona arrived in Tulsa, the woman she was supposed to meet did not appear, and she "didn't have anywhere to go." (Tr. 16-17, 27.) She met a stranger, however, named Maria Fitzpatrick, who provided housing for Ms. Gaona for some period of time. (Tr. 16-17, 67.) During this time, Ms. Gaona received no money from her family in Mexico. (Tr. 31.) She did not work either, although her husband and Ms. Fitzpatrick provided financial support. (Tr. 28, 76.) Ms. Gaona did not speak English. (Tr. 101.)

4.     Ms. Gaona further testified that, after arriving in the United States, she learned that she was pregnant with the child who is the Plaintiff here. (Tr. 16, 18, 31-32.) It was Ms. Gaona's first pregnancy. (Tr. 18, 101.) She did not see a doctor for pre-natal care. (Tr. 18.) She alleged that this was because she had just arrived in the United States; she was afraid to go to hospitals; she did not have insurance; and she "didn't have anything." (Tr. 18.)

5.     Plaintiff was born on October 9, 1988. (Tr. 35-37; Def.'s Trial Ex. 1.) The only direct, contemporaneous documentary evidence of that event is an authentic Mexican birth certificate for Plaintiff, which was registered in that country on April 6, 1989. (Def.'s Trial Ex. 1.) The document states that Plaintiff's place of birth is "La Florida, Cutzamala de Pinzon, Guerrero," Mexico. (*Id.*) The Mexican birth certificate is signed by Ms. Gaona (Tr. 20) and her mother, Ms. Lopez Duarte (Tr. 93, 95), and includes Plaintiff's fingerprint (Def.'s Trial Ex. 1).

6.     Plaintiff has three younger siblings. (Tr. 47, 58.) The oldest of the three, Zuleyma, was born in Mexico on January 31, 1990. (Tr. 58; Def.'s Trial Ex. 3.) Ms. Gaona

explained that she returned to Mexico to deliver Zuleyma because she "wasn't feeling good" and "didn't have insurance." (Tr. 21, 56; *see also* Tr. 73.) She testified that she returned to Mexico at the very end of December 1989 or in January 1990. (Tr. 54, 69-70.) She further stated that, upon her return, receiving massage rather than seeing a doctor was adequate to address her discomfort. (Tr. 57, 97, 119.)

7.      Ms. Gaona initially said that when she went to Mexico for Zuleyma's birth she remained there for approximately six months. (Tr. 21, 54, 56.) Ms. Gaona later agreed, however, that she had returned to the United States in October 1990 (Tr. 58-60) for a total absence from this country of nine or ten months. Ms. Gaona testified that Plaintiff remained with Ms. Fitzpatrick during this time. (Tr. 21-22, 55-56; *see also* Tr. 70.)

8.      For the following reasons, the testimony of Ms. Gaona, Ms. Fitzpatrick, Ms. Lopez Duarte, and the deposition of Pastor Victor Orta (Tr. 5) are not credible to the extent that these witnesses and the deponent attempt to place the location of Plaintiff's birth in Tulsa, Oklahoma, or anywhere in the United States.

        a.      Ms. Gaona was impeached with her deposition testimony regarding when she informed her parents of her pregnancy with Plaintiff. (Tr. 32-35.) Although the testimony of Ms. Lopez Duarte that she learned of the pregnancy before Plaintiff's birth would tend to corroborate Ms. Gaona's trial testimony on this point (Tr. 94), weighing against rehabilitation is the testimony that Ms. Gaona received no financial support from her family during her pregnancy with Plaintiff (Tr. 31) and the fact that Ms. Gaona did not have any questions for her mother about this, her first pregnancy, during which she received no medical care (Tr. 18, 101).

b.    It is implausible that Ms. Fitzpatrick, whose house in Tulsa, Oklahoma, was the purported location of Plaintiff's birth (Tr. 17-18, 68) and who was allegedly at home or nearby while Ms. Gaona was in labor (Tr. 35-36, 68, 84), did not assist in the birth – not even as an interpreter (Tr. 84).  Ms. Fitzpatrick said that her husband spoke "[n]ot a lot" of Spanish (Tr. 71; *see also* Tr. 87), and another woman who allegedly helped Mr. Fitzpatrick with the delivery spoke none (Tr. 82).  Meanwhile, Ms. Gaona did not speak English at the time (Tr. 101).  Ms. Fitzpatrick, however, testified at trial in Spanish (Tr. 69) but spoke primarily English with her husband (Tr. 71).  Ms. Fitzpatrick also had previously given birth four times at home.  (Tr. 83-84.)  It is simply unimaginable, therefore, that Ms. Fitzpatrick provided no assistance at all during Ms. Gaona's labor or delivery.  Ms. Fitzpatrick's only explanation for her absence was that "that scares me," apparently referring to delivery.  (Tr. 84.)  Even accepting that explanation, however, fails to account for Ms. Fitzpatrick's absence during labor that lasted more than a day prior to delivery.  (Tr. 35-37.)  Further diminishing her credibility regarding the alleged birth at her home, Ms. Fitzpatrick was confronted with an affidavit she signed stating that she was *physically present* and *witnessed* Plaintiff's birth, contrary to her testimony at trial (Tr. 90-91).  She explained only that "[m]aybe [she] misunderstood the question" (Tr. 91), but the conflicting statements give additional reason to doubt her credibility.

c.    It is implausible that Ms. Gaona, when allegedly returning to Mexico toward the end of her second pregnancy, left Plaintiff in the United States with Maria Fitzpatrick for a nine- or ten-month period (Tr. 21-22, 54-56, 58-60, 70), given that he was no more than 15 months old at the time his mother left.  (Tr. 55.)  And it is even

more unlikely given that Ms. Fitzpatrick also had as many as eight of her own children to look after, including a one- or two-year-old. (Tr. 28, 40, 74.)

d.      Plaintiff's Mexican birth certificate (Def.'s Trial Ex. 1) bears a fingerprint in a space identified on the document as "Fingerprint of the Registree," which the document makes clear is the Plaintiff, Ivan Torres. Ms. Gaona and Ms. Lopez Duarte both described a process through which the Mexican birth certificate was supposedly created by having it sent to the United States in a half-completed state for Ms. Gaona to sign and return. (Tr. 19-20, 40-45, 95-96, 101-08.) Ms. Gaona specifically denied placing the fingerprint on the document, however, and neither witness could explain how the presumed fingerprint of Plaintiff was affixed to the Mexican birth certificate. (Tr. 42-43, 65, 107-08.)

e.      Other inconsistencies arose in the testimony regarding how the Mexican birth certificate was created by sending the partially completed document to the United States. Ms. Gaona said that her mother sent a letter with the document instructing Ms. Gaona to sign the document. (Tr. 42-43.) Ms. Lopez Duarte, however, has limited literacy (Tr. 98) and denied sending any instructions to Ms. Gaona about how to complete the Mexican birth certificate. (Tr. 106.) Ms. Lopez Duarte also changed her testimony regarding how many times she visited a Mexican government office to complete the registration, first saying that she went only once to the civil registry to register Plaintiff (Tr. 103), but then saying that she went to the office a second time to complete the process (Tr. 106).

f.      While Ms. Lopez Duarte and Ms. Gaona both attempted to explain why they obtained a Mexican birth certificate for a child purportedly born in the United States,

there is no credible explanation for the creation of this document aside from the one appearing on its face (*i.e.*, to register a birth taking place in Mexico).

(i) Ms. Lopez Duarte initially testified that the only reason she went to the Mexican civil registrar's office to register Plaintiff's birth was because Ms. Gaona had not been able to vaccinate Plaintiff "because he was not registered." (Tr. 102-03, 115.) Yet in 2015, Ms. Lopez Duarte made a sworn statement before a notary in Mexico explaining the purported reason for obtaining the Mexican birth certificate, and that statement referred only to a "family tradition of registering family members in the United Mexican States," and not to the need for a document to facilitate Plaintiff's vaccinations. (Tr. 109-113; ECF No. 29-22.) Furthermore, while Ms. Lopez Duarte admitted to saying previously that it was a "family tradition" to register children in Mexico (Tr. 108), she denied making the "notarized sworn statement" (Tr. 108-09) until presented with the document, explaining then that she "thought it was an attorney we went to" and that she "didn't know it was a notary." (Tr. 110.) Ms. Lopez Duarte's minimal education (Tr. 98) possibly accounts for some confusion here, but the explanation is hardly persuasive. In any event, the 2015 statement made no mention of vaccinations as a reason for obtaining the Mexican birth certificate, and instead provided another reason, contrary to Ms. Lopez Duarte's testimony at trial that vaccinations were the only reason for obtaining the Mexican birth certificate. Moreover, the claim of any "family tradition" of registering children's births in Mexico is belied not only by Ms. Lopez Duarte not mentioning it initially in her testimony, but also by

the fact that Mexican birth certificates were not obtained for Plaintiff's two youngest siblings.  (Tr. 47, 114.)

(ii)     Ms. Gaona testified that approximately six months after Plaintiff was born, she took him to the "health department" for shots, but "they would not accept him because [she] did not have any document to show that he was [hers]." (Tr. 19-20; *see also* Tr. 38, 41.)  She explained that this was the reason the Mexican birth certificate was created.  (Tr. 19-20, 41.)  The Mexican birth certificate shows that Plaintiff's birth was registered on April 6, 1989, six months after his October 9, 1988 birth.  (Def.'s Trial Ex. 1.)  Assuming the truth of the testimony regarding preparation of that document, the finalized document would have been returned to Ms. Gaona no later than June 1989.  (Tr. 41-44, 105-06, 120.)  Ms. Gaona, seeking to have Plaintiff vaccinated, claimed that she presented the Mexican birth certificate to the "health department" "once [she] had it."  (Tr. 20.)  Yet she later said that she did not "remember exactly if it was '92, '93."  (Tr. 46.)  The record shows fairly regular vaccinations given to Plaintiff beginning in October 1989 and continuing in relevant part in December 1989, February 1990, April 1990, and February 1991.  (Pl.'s Trial Ex. 13.)  Ms. Gaona acknowledged the importance of the accuracy of these records.  (Tr. 54.)  It therefore appears that the Mexican birth certificate was not obtained for the reason that Ms. Gaona and Ms. Lopez Duarte claim, as it was not promptly used to obtain vaccinations for Plaintiff.

(iii)    Further undermining the purported reason given for the Mexican birth certificate is the fanciful claim made by both Ms. Gaona and Ms. Lopez

Duarte that, even while they were supposedly seeking the Mexican birth certificate (and even later after they obtained it), they were also arranging for vaccinations to be sent from Mexico to the United States for Plaintiff. (Tr. 51.) The incredible nature of this claim is set out below as an independent basis for not crediting either the witnesses' testimony or Plaintiff's vaccination record (Pl.'s Trial Ex. 13) to the extent this evidence is offered to show Plaintiff's birth in the United States. The point here is that the alleged existence of an alternative means of vaccinating Plaintiff indicates that the Mexican birth certificate was, even under Plaintiff's theory of the case, unnecessary for the purpose that the witnesses claimed.

g.     Plaintiff has offered as evidence his vaccination record which, as noted, records vaccinations given in October 1989, December 1989, February 1990, April 1990, and later dates. (Pl.'s Trial Ex. 13.) Ms. Gaona (Tr. 46, 48-55), Ms. Lopez Duarte (Tr. 114-18), and Ms. Fitzpatrick (Tr. 76-78) all testified that various vaccinations for Plaintiff were sent by Ms. Lopez Duarte from Mexico and administered to Plaintiff in the United States. Ms. Gaona stated that the first such vaccination occurred in 1989. (Tr. 49.) Several more vaccine deliveries allegedly followed. (Tr. 50-51.) Ms. Gaona testified that no one gave Plaintiff vaccinations when she was not present. (Tr. 48-49; *see also* Tr. 76, 78.) The evidence thus conflicts because Plaintiff's vaccination record (Pl.'s Trial Ex. 13) shows inoculations occurring in February and April 1990, yet according to her own testimony Ms. Gaona was in Mexico at those times due to her second child's birth. *See supra* ¶¶ 6-7. In attempting to explain this discrepancy regarding the February 1990 vaccination, Ms. Gaona – possibly referring to a no-longer-extant document from

Mexico recording some vaccination information that she allegedly provided (Tr. 53) – stated that "they would have maybe just written that down when they gave it over there, but they didn't give it to him." (Tr. 55.) At least because of Ms. Gaona's acknowledgement of the importance of accuracy in Plaintiff's vaccination records (Tr. 53-54), an explanation based on the records being incorrect as a result of information allegedly provided by Ms. Gaona is not persuasive. An equally if not more plausible explanation, never excluded at trial, would be that, even if the Oklahoma vaccination record incorporated no-longer-extant records from Mexico, those records in turn reflected vaccinations actually administered to Plaintiff when he was in Mexico.

       h.      Further discrepancies in the testimony regarding the alleged vaccination-importing arrangements also undermine both witness credibility and Plaintiff's vaccination record as a means of showing his presence in the United States during the very early years of his life. Ms. Lopez Duarte testified that she did not use the same person as a courier each time she had vaccines transported to the United States. (Tr. 117-18.) Ms. Gaona, however, indicated that a woman named "Rebecca" brought the vaccines from Mexico more than once (Tr. 48-51), and Ms. Fitzpatrick stated that "[a] lady" brought them "four or five times" although she also said she did not remember (Tr. 77). In addition, while Ms. Lopez Duarte stated that she obtained instructions for administering the vaccines but did not obtain syringes (Tr. 117), Ms. Gaona said that her mother did not send her any information about how to administer the vaccines (Tr. 51). Moreover, Ms. Fitzpatrick initially indicated that a syringe came together with the vaccine, although she then said she did not remember (Tr. 77). Considering the possible lack of instructions, it is noteworthy that Ms. Gaona stated that "Rebecca" supposedly

"knew how to inject" (Tr. 48) – but if "Rebecca" was not always the person to administer the vaccinations, then her knowledge would not always have been available. Meanwhile, Ms. Lopez Duarte testified that she did not know who would administer the vaccines she allegedly sent (Tr. 117), which is unusual if, as Ms. Gaona's testimony suggested (Tr. 48-51), Ms. Lopez Duarte was sending the vaccines with the person who would administer them. Finally, the testimony is uncertain whether Ms. Fitzpatrick's husband administered vaccines to Plaintiff (Tr. 49-50, 76, 117), and it is unclear whether his experience of driving an ambulance prior to 1978 (Tr. 29-30, 81) would have given him the necessary education and ability to do so in 1989 or the early 1990s. (Mr. Fitzpatrick had stopped driving an ambulance by 1978 and thereafter drove a truck (Tr. 81); there is no evidence to show he was a trained paramedic, notwithstanding Ms. Gaona's suggestion to this effect (Tr. 49).) To the extent that Ms. Fitzpatrick asserted that her husband or anyone else administered vaccinations to Plaintiff, her testimony is not reliable as, amongst her factual assertions on this issue, she stated more than ten times that she "didn't know." (Tr. 76-77.) Ms. Gaona never injected Plaintiff, and she asserted that "Rebecca" and Mr. Fitzpatrick were the only nonmedical professional to do so. (Tr. 50-51.) On balance, the evidence fails to show that anyone administered a vaccination to Plaintiff in the United States prior to 1991.

      i.      Pastor Victor Orta II was listed on Plaintiff's witness list filed July 17, 2017 (ECF No. 49), yet notice was given on the day of trial that he would not be testifying. (Tr. 5.) No explanation was provided. A copy of his October 6, 2015, deposition ("Depo.") is in evidence. (Tr. 5.) While the Pastor claimed in his deposition to have met Ms. Gaona during her pregnancy, he initially placed this meeting in 1986

(Depo. 11) and described how such a meeting would have occurred among 120 to 200 people or more gathering at his church (Depo. 22). The deposition is dramatically inconsistent regarding whether Pastor Orta was ever able to observe that Ms. Gaona was pregnant. (*Compare* Tr. 14-15 (Pastor denied noticing developing pregnancy) *with* Tr. 52, 54-55 (Pastor states pregnancy was "obvious").) Pastor Orta also stated that he did not converse with Ms. Gaona or talk with her about church matters or apparently anything else, referring to the earliest days in which he was supposedly aware of her. (Depo. 14-16.) Ms. Gaona, however, testified that Pastor Orta met and spoke with her when she was pregnant with Plaintiff; that he called her by her name; and that he would greet her or "invite[] [her] to come to the church." (Tr. 61.) In his deposition, Pastor Orta also stated that he never saw Ms. Gaona outside of church, referring to the time in which she was pregnant with Plaintiff and Plaintiff's infancy (Tr. 16, 53), and that he never saw Plaintiff as an infant with Ms. Gaona or at church. (Tr. 30, 36-37, 39, 44.) During the deposition, however, Pastor Orta was confronted with an earlier affidavit in which he had stated that he had "visited" Plaintiff and Ms. Gaona "at Maria Fitzpatrick's house the Christmas in [sic] 1988 to deliver food baskets for Gloria and Maria." (Tr. 53.[1]) The pastor explained the inconsistencies regarding whether he had seen Ms. Gaona outside the church, or seen Plaintiff as an infant with Ms. Gaona, by stating that his statements in the affidavit had been based on "assumptions." (*Id.*) Finally, Pastor Orta contradicted himself when he initially claimed that in 1986 or 1988, "somebody told [him] that Mrs. Gaona had a baby . . . I can remember that" (Depo. 31-32), only shortly

---

[1] The affidavit was marked as Exhibit 4 to the deposition, (Depo. 48), but was not included with the submission of the Orta deposition to the Court. It is available in the record, however, at ECF No. 29-26, as Exhibit 26 to Plaintiff's summary judgment motion.

thereafter stating that "[t]hey never said it was Ms. Gaona's child" (Depo. 33; *see also* Depo. 35).

j.     The partiality of Ms. Gaona and Ms. Lopez Duarte toward their son and grandson, respectively, is understandable in light of their family relationships but it should still be noted.  Ms. Fitzpatrick also agreed that she "want[ed] to help" Plaintiff (Tr. 72), as did Pastor Orta (Depo. 44, 67).  Regarding the demeanor of Ms. Gaona and Ms. Fitzpatrick, the Court agrees with the observations made the day immediately following their testimony (Tr. 145-46) and believes that their demeanor is a further reason detracting from their credibility.

k.     Finally, it is noteworthy that Plaintiff's father appears to have been a witness to events relevant to this case.  Ms. Gaona said that her husband saw Plaintiff two weeks after his birth.  (Tr. 37.)  He also allegedly visited Plaintiff "a couple of times" at Ms. Fitzpatrick's residence while Ms. Gaona was in Mexico in 1990.  (Tr. 56.)  Plaintiff's father appears to have been available to testify, as Ms. Lopez Duarte said that she had seen him "at his house" the day before she testified.  (Tr. 99.)  Given that Mr. Leobardo Torres apparently had relevant information, was available, and his absence was not explained, it is noteworthy that Plaintiff did not call him as a witness.  The same is true regarding Pastor Orta who, while named as a witness and whose deposition discloses alleged knowledge about events relevant to this case, was not called by Plaintiff to testify at trial, and whose absence was not explained.

9.     Plaintiff entered into evidence a valid order of the District Court in and for Tulsa County, State of Oklahoma, dated and filed on November 21, 2012, finding that Plaintiff was born on October 9, 1988, in Tulsa, Oklahoma, to Ms. Gloria Gaona and Mr. Leobardo Torres.

(Pl.'s Trial Ex. 17; Tr. 125.) A transcript of a state administrative proceeding has been admitted into evidence (Def.'s Trial Ex. 12), but there was virtually no testimony explaining these proceedings in relation to the state court order (Tr. 133); the Court finds these to be separate proceedings from those on which the state court order is based.

10.     As reflected on those documents and as Plaintiff testified (Tr. 123-24, 127), Plaintiff's SENTRI card (Pl.'s Trial Ex. 9),[2] Social Security card (Pl.'s Trial Ex. 6), voter ID card (Pl.'s Trial Ex. 7), Selective Service card (Pl.'s Trial Ex. 8), and driver's license (Pl.'s Trial Ex. 10) were all issued after the state court order finding Plaintiff to have been born in Tulsa, Oklahoma. With the possible exceptions of the driver's license and Selective Service card, Plaintiff presented the state court order to obtain these documents. (Tr. 123-24, 133.) Neither the driver's license nor the Selective Service card refer either to Plaintiff's place of birth or to his citizenship.

11.     The Court previously recognized that Plaintiff's SENTRI card (Pl.'s Trial Ex. 9) had been revoked and that it "constitutes, at most, secondary evidence in support of his passport application." (ECF No. 43, at 6 (reported at *Torres v. Kerry*, No. 14-cv-552, 2016 WL 6952189, at *3 (N.D. Okla. Nov. 28, 2016)); *see also* ECF No. 43, at 3-4 (describing primary and secondary evidence as defined under 22 C.F.R. § 51.42) (reported at 2016 WL 6952189, at *2).) The Court also noted that the state court order, the driver's license, the voter registration card, and other documents offered by Plaintiff constituted secondary rather than primary evidence of nationality. (*See* ECF No. 43, at 4 (reported at 2016 WL 6952189, at *2).)

---

[2] "The Secure Electronic Network for Travelers Rapid Inspection (SENTRI) is a U.S. Customs and Border Protection program that allows expedited clearance for pre-approved, low-risk travelers upon arrival in the United States," https://www.cbp.gov/travel/trusted-traveler-programs/sentri (last visited Dec. 11, 2017).

## II.  DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

### A.    Relevant Legal Standards

1.      There are two sources of United States citizenship: birth in this country and naturalization.  *See Miller v. Albright*, 523 U.S. 420, 423-24 (1998) (plurality) (citing *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898)).  The Court cannot grant citizenship based on equity alone or in the interests of justice; instead, the claimant can only be found a United States citizen pursuant to the means prescribed by law.  *See INS v. Pangilinan*, 486 U.S. 875, 883-85 (1988) ("[T]he power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their generally applicable equitable powers.  Rather, it has been given them as a specific function to be performed in strict compliance with the terms of an authorizing statute . . . .") (citations omitted).

2.      Aside from exceptions not relevant here, an individual's birth in the United States on October 9, 1988, would render that person a United States citizen under Section 1 of the 14th Amendment to the Constitution and 8 U.S.C. § 1401(a) (1982).[3]

3.      Under 8 U.S.C. § 1503(a), a person denied a right or privilege on the basis of non-nationality may file a declaratory judgment action for a determination of United States citizenship.  The action here arises under this statute, and there is no dispute that the prerequisites for Plaintiff to bring this action have been met.

4.      A trial pursuant to Section 1503(a) is conducted *de novo*.  *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980); *Richards v. Sec'y of State*, 752 F.2d 1413, 1417 (9th Cir. 1985); *Patel*

---

[3]  Where citizenship is acquired at birth, the relevant law is that existing at the time of birth.  *See Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001); *United States v. Gomez-Orozco*, 188 F.3d 422, 426 (7th Cir. 1999); *Ortega v. Kerry*, No. 14-cv-913, 2014 WL 3843870, at *4 (D. Colo. Aug. 5, 2014); *In re Rodriguez-Tejedor*, 23 I. & N. Dec. 153, 163 (BIA 2001).  The 14th Amendment was in effect, of course, in 1988; the 1982 edition of the United States Code contained the version of the implementing statute effective on October 9, 1988.

*v. Rice*, 403 F. Supp. 2d 560, 562 (N.D. Tex. 2005), *aff'd*, 224 F. App'x 414 (5th Cir. Apr. 10, 2007). Plaintiff bears the burden of proving, by a preponderance of the evidence, that he is a United States citizen by virtue of his alleged birth in the United States. *See Liacakos v. Kennedy*, 195 F. Supp. 630, 631 (D.D.C. 1961) ("[T]he burden of proof is on the plaintiff[;] [t]his burden of proof, however, need not be sustained beyond a reasonable doubt, but merely by a fair preponderance of the evidence, for naturally, the proceeding is of a civil nature."); *Tijerina v. Brownell*, 141 F. Supp. 266, 270 (S.D. Tex. 1956); *cf.* 22 C.F.R. § 51.40 ("The [passport] applicant has the burden of proving that he or she is a U.S. citizen or non-citizen national.").

5.     Proving a fact by a preponderance of the evidence means showing that the existence of said fact is more likely than not. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983); *Harvey v. Gen. Motors Corp.*, 873 F.2d 1343, 1349 n.2 (10th Cir. 1989).

6.     As this Court has already determined, there is no burden shifting analysis in a Section 1503(a) proceeding. *See* ECF No. 43, at 7 (reported at 2016 WL 6952189, at *3); *see also Cobos v. Kerry*, No. H-13-2897, 2015 WL 3965660, at *6 (S.D. Tex. June 30, 2015) ("There is no burden shifting analysis in this proceeding. The burden does not shift to the government to either produce evidence demonstrating that the plaintiff was born outside the United States or discrediting all of the plaintiff's evidence after she has made a *prima facie* showing of United States citizenship."); *Patel*, 403 F. Supp. 2d at 562 n.2 (noting authority appearing to reject a burden-shifting regime). Accordingly, the burden never shifts to Defendant to produce evidence demonstrating that Plaintiff was born outside the United States.

7.     When statutory eligibility for citizenship is at issue, Plaintiff must establish "eligibility for citizenship in every respect." *See Pangilinan*, 486 U.S. at 886 (quoting *Berenyi v. District Director*, 385 U.S. 630, 637 (1967)) (internal quotation marks omitted). The Court must

resolve all doubts regarding citizenship "'in favor of the United States and against' those seeking citizenship." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394-95 (5th Cir. 2006) (quoting *Berenyi*, 385 U.S. at 637).

8.      The testimony of interested witnesses in a Section 1503(a) proceeding should be examined closely.  *See Patel*, 403 F. Supp. 2d at 565-66 (N.D. Tex. 2005) (giving less weight to and discrediting the testimony of interested witnesses); *DeVargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958) (testimony of interested witnesses "to be taken with a grain of salt").

9.      While the Court reviews citizenship *de novo* in a section 1503(a) action, Department of State regulations regarding passport issuance are instructive.  *See Ramirez v. Clinton*, No. 08-5770, 2011 WL 2838173, at *4 (D. Minn. July 18, 2011) ("Although Department of State regulations are instructive, the court makes a de novo determination of citizenship."); *Rivera v. Albright*, 99-C-328, 2000 WL 1514075, at *1 (N.D. Ill. Oct. 11, 2000) ("Obviously the regulations are instructive.").  The regulations recognize primary and secondary types of documentary evidence for purposes of showing eligibility for a United States passport. Primary evidence of citizenship for a person claiming United States birth is an official birth certificate filed within one year of birth.  *See* 22 C.F.R. § 51.42(a).  If the applicant cannot submit a timely-filed birth certificate, he or she must submit secondary evidence sufficient to establish to the satisfaction of the Department that he or she was born in the United States.  *See id.* § 51.42(b).  Secondary evidence includes, but is not limited to, "hospital birth certificates, baptismal certificates, medical and school records, certificates of circumcision, other documentary evidence created shortly after birth but generally not more than 5 years after birth, and/or affidavits of persons having personal knowledge of the facts of the birth."  *Id.*

**B.      Application of Legal Standards to Evidence Presented at Trial**

1.      The Court has found that Plaintiff's witnesses and the Orta deposition are not credible to the extent that they assert Plaintiff was born in Tulsa, Oklahoma, or anywhere in the United States.  *See supra* Pt. I, ¶ 8 (and subparts thereof).  In making this assessment, the Court took into account the content of the testimony, the demeanor of the witnesses, the documentary evidence, and the unexplained absence of material witnesses (Plaintiff's father and Pastor Orta).  In addition, while Defendant need not carry a burden of proof in this case, the Court has considered an alternative theory proposed by Defendant to explain the evidence.  (Tr. 146-47.)  The Court agrees that Plaintiff's evidence fails to show that it is more likely that he was born in the United States compared to the alternative possibility that Plaintiff's mother – a 16-year-old pregnant for the first time, away from home, unable to speak English, and with few resources beyond her new acquaintance, Ms. Fitzpatrick – did what she admittedly did do when she was pregnant with her second child: return to Mexico to deliver Plaintiff.  This theory makes sense of the otherwise unexplained fingerprint of Plaintiff appearing on Defendant's Trial Exhibit 1 (as well as a reference to Mexico as Plaintiff's birthplace in a 2003 medical record, Pl.'s Trial Ex. 14), and it more plausibly explains how Plaintiff received regular vaccinations during his early years as reflected on his vaccination record (Pl.'s Trial Ex. 13).  Given that this possible alternative explanation of events is at least as likely as Plaintiff's, the Court *cannot* find that Plaintiff's evidence shows that it was more likely than not that he was born in the United States.

2.      Specifically detracting from Plaintiff's case is the existence of an undisputedly valid Mexican birth certificate which was signed by his mother and grandmother, bears his fingerprint, was registered on April 6, 1989, approximately six months after Plaintiff's October 9, 1988, birth, and which states that he was born in Mexico.  (Def.'s Trial Ex. 1.)  The State

Department considers a birth certificate filed within one year of birth to be contemporaneous. *See* 22 C.F.R. § 51.42(a). Plaintiff's Mexican birth certificate thus strongly tends to show that in fact he was born in Mexico. *See Sanchez v. Kerry*, No. 4:11-cv-2084, 2014 WL 2932275, at *4 (S.D. Tex. June 27, 2014) ("contemporaneously-filed foreign birth record creates a presumption of alienage and is almost conclusive evidence of birth in that country"), *aff'd*, 648 F. App'x 386 (5th Cir. Dec. 14, 2015), *cert. denied*, 137 S. Ct. 65 (2016). This is all the more true because, as noted *supra* Pt. I, ¶ 8.f, the reasons offered by Plaintiff for the creation of his Mexican birth certificate notwithstanding his alleged birth in the United States are implausible, unpersuasive, and lack credibility.

3.      Plaintiff's documentary evidence as set forth in his trial exhibits does not support his claim to birth in the United States. There is no reason to believe that any of these documents, except for the state court order (Pl.'s Trial Ex. 17; Tr. 133), reflect any independent adjudication of Plaintiff's place of birth. In most instances, the documents either do not refer to Plaintiff's place of birth or citizenship, or else Plaintiff testified that he presented the 2012 state court order to obtain them, suggesting that the documents relied on the state court order if they include a determination of birthplace or citizenship. *See supra* Pt. I, ¶ 10.

4.      With respect to the November 21, 2012, state court order ruling that Plaintiff was born in Oklahoma, the Court concludes that this order is also unsupportive of Plaintiff's claim to United States citizenship. The earlier proceedings on which this order was based were not established in this case. *See supra* Pt. I, ¶ 9. It is therefore not apparent whether the state court considered evidence that was substantially different from that presented here. In any event, this Court is entitled to review the evidence *de novo* unless the Court is somehow legally bound by the state court order.

5.     In these proceedings, this Court is not legally bound in any manner by the November 21, 2012, state court order. "The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute" – *i.e.*, 28 U.S.C. § 1738 – "which provides that state judicial proceedings 'shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.'" *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (quoting 28 U.S.C. § 1738). Under Oklahoma law, Defendant would only be subject to offensive collateral estoppel based on the state court order if, in part, Defendant had had a full and fair opportunity to litigate the issue decided therein. *See Cities Serv. Co. v. Gulf Oil Corp.*, 980 P.2d 116, 125 (Okla.), *cert. dismissed*, 528 U.S. 1014 (1999); *Powell v. Miller*, Nos. CIV-2010-1294-D, etc., 2015 WL 1461367, at *5-6 & n.14 (W.D. Okla. Mar. 20, 2015). That is not the case here, where there is no claim or indication that Defendant participated or otherwise had any opportunity to litigate any issue in the prior state court proceedings leading to the November 21, 2012 order.

6.     Furthermore, the state statute under which the November 21, 2012 order issued, Okla. Stat. tit. 63, § 1-315, does not affect this Court's conclusion regarding the state court order lacking any binding effect. The statute, which has not been interpreted by any court in a reported decision, concludes that an order issued under the provision can "establish[] the time and place of birth, [and] the age and the parentage of the applicant," and "shall be final and conclusive of all the facts therein adjudged." Okla. Stat. tit. 63, § 1-315. The statute does not state, however, upon whom such orders are conclusive. In this respect, the Restatement (Second) of Judgments § 31 is instructive. This provision concerns the preclusive effect of "Judgments Determining Status" and distinguishes between actions "whose purpose is to determine or change a person's

status" and actions "other than [those] whose purpose is to determine or change . . . status."

Restatement (Second) of Judgments § 31(1), (2), (3) (Am. Law Inst. 1982). Examples of the

kinds of "status" determined in such proceedings include citizenship and the parent-child

relationship. *See id.* § 31 cmt. a. Most importantly here, the Oklahoma statute under which the

November 21, 2012, order issued begins: "Any citizen of the United States . . . ," and then states

further conditions for a party to seek issuance of an order pursuant to the statute. *See* Okla. Stat.

tit. 63, § 1-315. By including United States citizenship *as a condition* on suing under the

provision, the statute makes clear that such proceedings are not intended to establish United

States citizenship, even while they may establish other types of status. Construing the Oklahoma

statute in this manner, Section 31(3) of the Restatement shows that any incidental determination

of a fact relevant to citizenship would not be binding on a non-party to that determination.[4] This

describes Defendant here, notwithstanding the "conclusive" language in the Oklahoma statute.

*See Ranger Ins. Co. v. Gen. Accident Fire and Life Assurance Corp.*, 800 F.2d 329, 333 n.6 (3d

Cir. 1986) (relying on Section 31(3) to reject argument that a prior determination regarding the

non-existence of a common law marriage was binding on a non-party to that determination,

despite a Pennsylvania statute indicating that such determinations are "conclusive upon all

persons concerned," because the determination was not made in a proceeding the purpose of

which was to make that determination).

      7.    Alternatively, even if the purpose of a proceeding under Okla. Stat. tit. 63,

§ 1-315, could be to determine United States citizenship, the Restatement of Judgments further

---

[4] Section 31(3) states: "The determination of a person's status in an action other than one whose purpose is to determine or change that status is conclusive upon the parties to the action, in accordance with the rules of issue preclusion, except in a subsequent action whose purpose is to determine or change the status in question." Restatement (Second) of Judgments § 31(3) (Am. Law Inst. 1982).

provides for an exception to the conclusive effect of such a determination. Specifically, the Restatement qualifies the effect of such proceedings "[i]f a person has, under applicable law, an interest in such status such that he is entitled to contest [the status's] existence," and that person was not "afforded an opportunity to be a party to the [initial] action." Restatement (Second) of Judgments § 31(2) (Am. Law Inst. 1982). Defendant here (effectively, the federal government) has such an interest in light of the need "[t]o establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to keep shut "the floodgates for abuse" that could open if adjudications of United States citizenship were consigned to proceedings where the federal government was not a party. *See Bustamante-Barrera*, 447 F.3d at 400-01 (state court decree determining child's custody status not binding in naturalization proceedings "in determining Petitioner's custody status for purposes of the subject section" of the Immigration and Nationality Act, and referring to potential "for abuse" if the rule were otherwise). As Defendant had no opportunity to participate in the prior Oklahoma state court proceeding, he is not bound by the decision rendered in that proceeding.

8. Plaintiff has not met his burden of proving his birth in the United States by a preponderance of the evidence. Pursuant to 8 U.S.C. § 1503(a) and the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court therefore declares that Plaintiff is not a United States citizen based on birth in the United States and is not eligible for a United States passport. Judgment shall be entered in favor of Defendant.

/ / /

/ / /

Dated: December 13, 2017                     Respectfully submitted,

                                             CHAD A. READLER
                                             Acting Assistant Attorney General
                                             Civil Division

                                             WILLIAM C. PEACHY
                                             Director, Office of Immigration Litigation
                                             District Court Section

                                             AARON S. GOLDSMITH
                                             Senior Litigation Counsel

                                             DANIELLE K. SCHUESSLER
                                             Trial Attorney

                                             /s/ *W. Manning Evans*
                                             W. MANNING EVANS, Senior Litigation Counsel
                                             Attorney-in-Charge, Cal. Bar No. 142446
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation-DCS
                                             P.O. Box 868, Ben Franklin Station
                                             Washington DC  20044
                                             Telephone: (202) 616-2186; Fax: (202) 305-4829
                                             E-mail: Manning.Evans@usdoj.gov

                                             *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2017, I electronically transmitted the foregoing to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

William Douglas Thomas
doug@thomas-law.org
*Counsel for Plaintiff*

/s/ *W. Manning Evans*
W. MANNING EVANS
Senior Litigation Counsel
Attorney-in-Charge, Cal. Bar No. 142446
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington DC 20044
Telephone: (202) 616-2186
Facsimile: (202) 305-4829
E-mail: Manning.Evans@usdoj.gov